FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

JMM:WPC
F.#2009R00164

JUN 22 2010

UNITED STATES DISTRICT COURT LONG ISLAND OFFICE **10-0719M**
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

DAVID SPAGNOLI,
    also known as
    "John Corbin," and
KEVIN KLATMAN,
    also known as
    "Mike Manto,"

          Defendants.

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

THE PREMISES KNOWN AND DESCRIBED
AS A TWO STORY BUILDING LOCATED AT
1683 ROOSEVELT AVENUE, BOHEMIA,
NEW YORK

- - - - - - - - - - - - - - - -X

    __FILED UNDER SEAL__

    AFFIDAVIT IN SUPPORT
    OF SEARCH AND ARREST
    __WARRANT APPLICATION__
    (18 U.S.C. §§ 1084, 1343,
     1955 and 1956)

EASTERN DISTRICT OF NEW YORK, SS:

        ERIC MANCINI, being duly sworn, deposes and says that

he is a Special Agent  with Immigration and Customs Enforcement

("ICE"), duly appointed according to law and acting as such.

        Upon information and belief, in or about and between

November 2008 and May 2010, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendants DAVID SPAGNOLI, also known as "John Corbin," and

KEVIN KLATMAN, also known as "Mike Manto," together with others,

while engaged in the business of betting and wagering, did knowingly and intentionally use a wire communication facility, to wit: a telephone, for the transmission in interstate commerce of bets, wagers, and information assisting in the placing of bets and wagers on sporting events and contests, in violation of Title 18, United States Code, Section 1084(a).

On information and belief, there is probable cause to believe that there will be located in THE PREMISES KNOWN AND DESCRIBED AS A TWO STORY BUILDING LOCATED AT 1683 ROOSEVELT AVENUE, BOHEMIA, NEW YORK (the "SUBJECT PREMISES"), within the Eastern District of New York, financial records, including but not limited to books, records, documents and electronic and computer files, all of which may constitute evidence, instrumentalities and fruits of violations of Title 18, United States Code, Sections 1084, 1343, 1955 and 1956.

The source of your Affiant's information and the grounds for his belief are as follows:[1]

1.    I have been a Special Agent with Immigration and Customs Enforcement ("ICE") for approximately three years.  I am currently assigned to the Long Island Office of Immigration and

---

[1] As this affidavit is submitted only to illustrate that probable cause exists to believe that the defendants committed certain crimes as well as for the limited purpose of establishing probable cause to search the SUBJECT PREMISES, all the facts known to me as a result of my investigation have not been included.

2

Customs Enforcement.  During my tenure with ICE, I have participated in numerous criminal investigations involving money laundering, counterfeit goods trafficking, drug trafficking and human trafficking throughout the course of which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed numerous taped conversations and records of financial crimes.  Through my training, education and experience -- which has included instruction on money laundering techniques, conducting numerous searches of locations where money and financial records have been found, and conducting surveillance on numerous occasions of individuals engaged in money laundering -- I have become familiar with the manner in which money is laundered, and the efforts of persons involved in such activity to avoid detection by law enforcement.  I have also consulted with other agents and law enforcement officials about illegal gambling and book making, and the methods by which gambling enterprises recruit and retain customers, and how the profits of those illegal activities are concealed.

     2.  Together with other ICE agents, I have been conducting an investigation into a fraudulent scheme devised and implemented by the defendants.  The facts set forth in this affidavit are based on my review of court-authorized interceptions of wire communications, as set forth below; my review of documents; and interviews with witnesses and other law

3

enforcement as well as physical surveillance and observations by myself and other law enforcement officers assisting in this investigation.

3.     Beginning in November, 2008, ICE conducted an investigation into the suspected gambling operations originating at 1683 Roosevelt Avenue, Bohemia, New York located near the northeast corner of the intersection of Roosevelt Avenue and Sunrise Road (the "SUBJECT PREMISES").   ICE surveillance at the SUBJECT PREMISES revealed that the defendants DAVID SPAGNOLI and KEVIN KLATMAN each appeared at the SUBJECT PREMISES separately and together.

### The SUBJECT PREMISES

4.     The SUBJECT PREMISES is located near the northeast corner of the intersection of Roosevelt Avenue and Sunrise Road at 1683 Roosevelt Avenue, Bohemia , New York 11716.   It is a two story building in a residential neighborhood.   Records from the Suffolk County Department of Planning and Development's Certificate of Occupancy for the SUBJECT PREMISES reveals that it is a one-family dwelling with a detached garage.   An exterior photograph of the SUBJECT PREMISES is attached hereto as Exhibit 1.

5.     Public databases reveal that one of the owners of the SUBJECT PREMISES is defendant DAVID SPAGNOLI.

4

6.   Public records also reveal that the SUBJECT PREMISES is the primary business location for IE Industries, Inc., and All Pro Sports, Inc.

7.   Additionally, individuals observed at the SUBJECT PREMISES include:

a.   DAVID SPAGNOLI, also known as "John Corbin," is believed to reside at 22 Abets Creek Path, East Patchogue, New York.   ICE surveillance agents have observed SPAGNOLI entering and inside of the SUBJECT PREMISES on numerous occasions.   As recently as June 17, 2010, ICE surveillance revealed that SPAGNOLI's automobile was parked at the SUBJECT PREMISES.   SPAGNOLI also used an AT&T mobile telephone with number 516-776-8071, which was subscribed to David Spagnoli, 129 Bloomingdale Road, Levittown, New York, with the financially liable party listed as Jane Doe #1, an individual whose identity is known to your Affiant, 22 Abets Creek Path, East Patchogue, New York 11772 (hereinafter, "SPAGNOLI's cell phone").   As further described below, SPAGNOLI's cell phone was the subject of court authorized wire interceptions.

b.   KEVIN KLATMAN, also known as "Mike Manto," is believed to reside at 8 HAIG Avenue in East Patchogue, New York.   ICE agents have observed KLATMAN entering and inside of the SUBJECT PREMISES on numerous occasions.   As recently as

5

June 17, 2010, ICE agents observed KLATMAN's automobile parked at the SUBJECT PREMISES.

### IE Industries, Inc., and All Pro Sports, Inc.

8.    Records from the New York State Department of State Division of Corporations show that All Pro Sports, Inc. is an active domestic business corporation, incorporated on August 8, 1996.  JOHN DOE #1, an individual whose identity is known to your Affiant, is listed as the "Chairman or Chief Executive Officer."  The address for service is the SUBJECT PREMISES.  The New York Department of State's records further reveal that IE Industries Inc. is an active domestic business corporation which was incorporated on March 22, 2006.  JOHN DOE #2, an individual whose identity is known to your Affiant, is listed as the "Chairman or Chief Executive Officer."  The address for service is the same as the SUBJECT PREMISES.

9.    IE Industries, Inc. maintains an Internet website at www.insideedgesports.net, which claims to provide advice on gambling and offers an "absolutely free weekend of investment plays."  IE Industries, Inc. does not appear to operate anything other than a business related to gambling.  As of June 7, 2010, IE Industries's website was still open and active.

10.    Sideline Access maintains an Internet website at www.sidelineaccess.com and holds itself out to be a business that provides information and advice for sports betting.  In the

Sideline Access website, the website administrative contact is listed as IE Industries, Inc. and the address for the registrant is the same as the SUBJECT PREMISES. The Sideline Access website also provides contact telephone numbers. The subscriber for each of those telephone numbers is IE Industries at the SUBJECT PREMISES and the contact person is listed as Jane Doe #1. Finally, the Sideline Access website identifies its CEO as "John Corbin." A man with that same name has repeatedly spoken with an Undercover Agent as further described below. As of June 7, 2010, the Sideline Access website was still open and active.

### FACTS SUPPORTING PROBABLE CAUSE

11. Beginning in November, 2008, ICE conducted an investigation into the gambling operations originating at the SUBJECT PREMISES. As part of this investigation, ICE agents have collected the paper trash from the SUBJECT PREMISES that consisted of pre-printed forms that tracked gambling customers. These forms listed an personal information for bettors, methods of payment such as credit card transactions or Western Union payments, the amount transacted, the name or identification number of the person who took the bet. Subsequent investigation revealed that the names used to take bets were pseudonyms and included the pseudonym "John Corbin." On the back of these forms recovered from the trash the bets were recorded together with win or loss tallies of total winnings or losses. Moreover, internal

7

memos also recovered from the trash scheduled the daily working hours to coincide with certain identified sports, namely, football and basketball. These memos bore date and time notations which coincided with known sporting events.

12. Numerous Western Union and Moneygram receipts were found in the trash. Many receipts listed "David Spagnoli" as the recipient. Additionally, in a memo found in the trash titled "Accepted Payments," a line after "Western Union" stated in bold lettering: "TO: DAVID SPAGNOLI NOTHING OVER $2500." I have learned during the course of this investigation that money remitters, like Western Union, must maintain records including the sender's identity for all transactions of $3,000 or more. Consequently, the annotation referring to "nothing over $2500" appears to be intended to evade the money remitter reporting requirement.

13. Also discovered in the paper trash were computer generated documents related to Diamond Sportsbook which is an Internet-based sports bookie or bookmaker that takes bets on sporting and other events at agreed upon odds operating out of Costa Rica through the website 2betdsi.com.

14. Also discovered in the paper trash were salary and earnings documents related to the payroll of IE Industries. The documents reveal that SPAGNOLI and KLATMAN each were paid by IE Industries.

The Undercover Agent

15.   On June 8, 2009, an undercover ICE agent (the "UC
Agent"), posing as a gambling customer, called one of the
telephone numbers identified in the Sideline Access website.  In
a consensually recorded call that I monitored and have reviewed
the UC Agent spoke to a male who identified himself as "Mike
Manto."  "Manto" called himself a "sports consultant," who for a
fee, could provide information that would increase a gambler's
odds of winning.  "Manto" claimed that as a result of his
information the UC Agent could make $1,250 to $1,500 from sports
betting within seven days.  "Manto" told the UC Agent that he
could contact "Manto" to consult with him on which bets to make
seven days a week.  The price for this service was a $250 flat
fee.  The UC Agent agreed to engage "Manto"'s services and
charged the fee to an  undercover credit card.

16.   In a subsequent conversation also on June 8th
between the UC Agent and "Manto" gave the UC Agent his telephone
number, which later investigation revealed was subscribed to by
IE Industries located at the SUBJECT PREMISES.  Subsequently, the
UC Agent called "Manto" several times, ostensibly for the purpose
of gaining information to assist him in how to place bets with a
fictitious local third party bookie.

17.   On June 25, 2009, "Manto" told the UC Agent that
he should call a person named "John Corbin," who, according to

"Manto" was the owner of the company where "Manto" worked. "Manto" claimed that "Corbin" was located in Las Vegas, Nevada and gave the UC Agent "Corbin's" alleged Las Vegas number, 702-417-5302 ("Corbin's Las Vegas telephone"). Based on "Manto's" statements and the conversations described below, I believe that the UC Agent was told that "Corbin" was in Las Vegas, which is a well known gambling destination, in order to convince the UC Agent that "Corbin" was well connected to gambling activities.

18.   On June 25, 2009, at approximately 2:30 p.m., the UC Agent called "Corbin" at Corbin's Las Vegas telephone. Phone records reveal that Corbin's Las Vegas Telephone was used almost exclusively for incoming calls only. In the call, "Corbin" told the UC Agent that he would immediately return the UC Agent's call.

19.   Ten minutes later, at approximately 2:40 p.m. that same day, "Corbin" called the UC Agent from telephone number 631-218-1757, which was a blocked number. Telephone records reveal that the subscriber for this telephone number was IE Industries at the SUBJECT PREMISES. "Corbin" asked the UC Agent for background information such as job information and gambling information including the amount gambled. In the call, "Corbin" claimed to have "guarded" and "priceless" information for sports betting and gambling. He stated he could make the UC Agent "an absolute fortune" through sports betting. He asked the UC Agent

whether the UC Agent used "a local guy" or "an offshore account" for gambling, to which the UC Agent acknowledged using a local bookmaker. "Corbin" speculated that as a result of his advice to the UC Agent, there would come a time when the UC Agent's bookmaker would refuse to deal with the UC Agent because the UC Agent would be making too much money. The UC Agent believed that "Corbin" was suggesting that the UC Agent would need another bookmaker. "Corbin" stated he would then establish multiple offshore gambling accounts for the UC Agent. Such offshore accounts, according to "Corbin", would be beneficial to the UC Agent because it would allow for the concealment of the UC Agent's winnings, it would provide convenience to the UC Agent in placing bets particularly because "Corbin" would have access to the funds so that he would  presumably place bets on behalf of the UC Agent, and because the UC Agent would experience difficulties with continuing his relationship with the UC Agent's local bookmaker because of the increase in winnings based upon "Corbin's" sports betting information. "Corbin" further stated that once the UC Agent amassed a few thousand dollars, "Corbin" would recommend certain offshore gambling accounts which would be easy to establish and use. "Corbin" claimed that the UC Agent would easily win a net profit of $75,000. Finally, "Corbin" asked the UC Agent how much money the UC Agent could gather by the next day.

11

20.   The next day, on June 26, 2009, at approximately
4:18 p.m., the UC Agent received a call from "Corbin," who called
from a number subscribed to by IE Industries at the SUBJECT
PREMISES (the "IE Industries cell phone").   In the call, "Corbin"
asked the UC Agent the amount of cash the UC Agent had immediate
access to for purposes of getting sports advice from "Corbin,"
who claimed to have better quality and more exclusive
information.   The UC Agent stated that the UC Agent did not have
access to more than a few hundred dollars at this time.   Later
that same day, at approximately 5:09 p.m. "Corbin" called the UC
Agent from the IE Industries cell phone and told the UC Agent to
send cash through Western Union to one of his "runners" in New
York.   The UC Agent told "Corbin" that the UC Agent could send
$2,500 the following week.   "Corbin" stated that his runner might
be traveling to Las Vegas that weekend.   "Corbin" also stated
that his "runner" was named "Kevin Klatman."   The UC Agent
believed that "Corbin" mentioned Klatman's Las Vegas trip to
bolster his gambling bona fides and to convince the UC Agent that
"Corbin" was well connected to gambling activities in Las Vegas.

21.   On June 27, 2009, the UC Agent received calls from
the SPAGNOLI's cell phone at 1:03 p.m. and 1:04 p.m..   "Corbin"
left the UC Agent a voicemail asking whether the UC Agent was
going to use his services and asked the UC Agent to return his
call.

12

22.   On June 30, 2009, at approximately 3:07 p.m., the UC Agent called "Corbin" at Corbin's Las Vegas telephone.  The UC Agent apologized for the communication problems and stated that the UC Agent could send "Corbin" approximately $3,000 for sports betting advice.  "Corbin" responded that he would advance the balance and the UC Agent would be liable to reimburse "Corbin" "on the back end," meaning that the UC Agent could pay him back at a later date.  "Corbin" stated that the UC Agent should send the money by Western Union as soon as "Corbin" confirmed the availability of a runner.

23.   On June 30 at approximately 7:48 p.m., "Corbin" called the UC Agent using SPAGNOLI's cell phone.[2]  "Corbin" told the UC Agent to send the money by Western Union to KEVIN KLATMAN, who is referred to as a "runner."  Later that day, the UC Agent sent approximately $3,000 to KLATMAN by Western Union.

24.   On July 18, 2009, at approximately 1:00 p.m., "Corbin" called the UC Agent using SPAGNOLI's cell phone and left a voicemail asking the UC Agent to call him back to discuss future dates and stated that "nothing was done yesterday as far as moving on anything out in Vegas."  The next day, July 19, at approximately 2:47 p.m., "Corbin" called the UC Agent using SPAGNOLI's cell phone and advised the UC Agent to bet on Colorado

---

[2]     Due to a recorder issue only the UC Agent's voice was recorded.

over San Diego in a Major League Baseball game that was scheduled to start in an hour.

25.   On July 28, 2009, at approximately 2:12 p.m., "Corbin" called the UC Agent from the IE Industries cell phone. "Corbin" explained that his phone system had a "security feature" that automatically disconnects with telephone numbers it does not recognize.   "Corbin" told the UC Agent that he had sports betting plans for pre-season football that would make money for the UC Agent when the UC Agent made bets.

26.   On August 6, 2009, at approximately 7:05 p.m., "Corbin" called the UC Agent using SPAGNOLI's cell phone and informed the UC Agent to hold off on betting on any games and to call him the following day.

27.   On August 11 2009, at approximately 6:38 p.m., "Corbin" called the UC Agent using SPAGNOLI's cell phone and asked whether the UC Agent's bookie took bets for pre-season football.   "Corbin" reiterated that the UC Agent will make lots of money utilizing "Corbin's" information when making bets. "Corbin" asked whether there would be a problem collecting from the UC Agent's bookie.   When the UC Agent replied that it may be problematic collecting such large winnings from the bookie, "Corbin" recommended that half of the winnings from the upcoming weekend be placed into an offshore gambling account.

14

28. On August 13, 2009, at approximately 12:39, "Corbin" attempted to reach the UC Agent using SPAGNOLI's cell phone. The UC Agent received over 15 phone calls from SPAGNOLI's cell phone for the remainder of August 2009, but they did not speak.

29. On October 6, 2009, the UC Agent spoke to "Manto" on another phone subscribed to IE Industries, and told "Manto" that he was prepared to send $3,500 to "Corbin" for betting advice and asked "Manto" to contact "Corbin". "Corbin" called the UC Agent approximately two hours later on the IE Industries cell phone and asked that the UC Agent not send the money all in one transaction. "Corbin" instructed the UC Agent to divide the amount since some of the money would go directly to a "runner" that would forward money to individuals possessing information on upcoming football games and told the UC Agent to send money to KLATMAN and SPAGNOLI. The UC Agent was told that SPAGNOLI was a runner for the people who had certain information on upcoming football games. The UC Agent, at approximately 7:04 p.m., sent $2,000[3] by Western Union to KLATMAN. The UC Agent sent approximately $1,300.00 to SPAGNOLI by Moneygram, as directed by "Corbin".

30. On October 8, 2009, at approximately 6:09 p.m., the UC Agent received a call from "Corbin" from the IE Industries

---

[3]    The transaction included a $160.00 service fee to Western Union.

cell phone, discussing football betting.  Near the end of the
conversation "Corbin" stated, "we're a little off subject, but
ahh, something that I really didn't discuss yesterday as far as
your, ahh, little sabbatical that you were on this had nothing to
do with a sting operation, you don't work for the United States
Government, do you?"  The UC Agent denied working for the
government.  "Corbin" then stated, "well I know you were very
evasive about where you were for like a week so I just want to,
ahh, you know, make sure that, ahh, that everything is on the up
and up and we can sit back and make money."  Prior to this
conversation it was reported in a local newspaper that gambling
related arrests had taken place in the New York city area.

        31.  On October 15, 2009, at approximately 8:35 p.m.,
"Corbin" called the UC Agent using SPAGNOLI's cell phone.
"Corbin" spoke about money sent to his runner, DAVID SPAGNOLI,
who he claimed was his inside person on the NFL information with
over-unders.[4]  "Corbin" stated that he wanted the UC Agent to
send the $2,000 he believed the UC Agent had earned to his
runner, KEVIN KLATMAN, and that "Corbin" would reduce the UC
Agent's balance so that they would be settled after the $2,000
was sent.  "Corbin" claimed that he would advance this money on

_____

[4]    An over-under or over/under bet is a wager in which a sports
bookmaker or bookie will predict a number for a statistic in a
given game (oftentimes the combined score of the two teams), and
bettors wager that the actual number in the game will be either
higher or lower than that number.

the UC Agent's behalf until the Western Union money arrived.
"Corbin" told the UC Agent that he would be able to put thousands
of dollars in his pocket every week after his balance was paid.
"Corbin" stated that he had future games which would be
profitable for the UC Agent to bet upon.

### SPAGNOLI's Bahamas Trip

32.   On September 20, 2009, SPAGNOLI was scheduled to
board a flight from Nassau, the Bahamas to Fort Lauderdale,
Florida.  Customs and Border Protection ("CBP") officers
conducted a search of SPAGNOLI, and recovered from his possession
documents that appeared to be lists of wagers and bettors.

33.   The documents were similar to the types of
documents found among the paper trash at the SUBJECT PREMISES
described above.  In addition, the results of wagers were
recorded on the forms and some of the players were noted as
"local book" and/or "offshore."

34.   Online sports book web sites were referenced in
the notes carried by SPAGNOLI.  One of the notes read "12,000
OFFSHORE (JUSTBET.COM)."  The www.justbet.com website is a
foreign based website for sports bookmaking.  Written below this
note is what appeared to be a login identification and password.

35.   The documents SPAGNOLI carried also referred to
the UC Agent by his undercover name.  On one of the pre-printed
forms described above, the UC Agent's undercover name, address

and phone number, and other personal information, were listed.
Also listed was the UC Agent's credit card information recorded
with the date and amount of the initial fee.  Additionally, the
numbers "1250/1500" were written, corresponding to the initial
amount the UC Agent was told he would make on wagers shortly
after subscribing to the services.  The dates and results of some
of the UC Agent's fictitious wagers were also kept track of.  The
UC Agent was described as "Bets $200/$250" and the word "local"
was written down, referring to the UC Agent's comment about using
a local bookie.  In addition, the notes stated that "John Corbin
– owner lost client leaving country 150 clients 3 per state."
The cell phone number of "John Corbin" was also written on the
sheet.

        36.  Another document also listed other apparent
subscribers and their respective personal information similar to
the UC Agent.  The names listed on the documents SPAGNOLI
possessed included JOHN DOE #3, JOHN DOE #4, JOHN DOE #5 and JOHN
DOE #6.  The identities of the individuals designated as JOHN DOE
#3, JOHN DOE #4, JOHN DOE #5 and JOHN DOE #6 are known to your
Affiant.

        37.  The sheet with JOHN DOE #3's name included his
credit card information along with his address and telephone
number in Illinois.  The sheet with JOHN DOE #4's name included
his credit card information along with his address and telephone
number in Pennsylvania.  The sheet with JOHN DOE #5's name listed

his address and telephone number in Nevada.  The sheet with JOHN
DOE #6's name included his address in California.

### Interception of Wire Communications

38.  On March 17, 2010 and again on April 21, 2010,
United States District Judge, the Honorable Sandra J. Feuerstein,
granted the government's application and ordered wire
interception of SPAGNOLI's cell phone.  Interception terminated
and the final disks were sealed on May 24, 2010.

39.  ICE surveillance revealed that SPAGNOLI conducted
his telephonic gambling/fraud business at the SUBJECT PREMISES.
Moreover, based upon all the known evidence, it appears that
SPAGNOLI is in fact the same person as "Corbin".  My belief is
based upon the following facts: "Corbin" used SPAGNOLI's
telephone; SPAGNOLI possessed documents with "Corbin's" name when
detained by CBP and are of the same type as those found at the
SUBJECT PREMISES; SPAGNOLI also possessed documents when detained
which contained the UC Agent's undercover name; I have listened
to the phone calls between the UC Agent and "Corbin" as well as
the phone calls made from SPAGNOLI's cell phone during the
authorized wire interceptions and have determined that "Corbin's"
voice is one and the same as SPAGNOLI's voice.  Moreover, it
appears that KLATMAN is in fact the same person as "Manto."  My
belief is based upon the following facts:  "Manto" used an IE
Industries phone; Manto spoke to the UC Agent using KLATMAN's
cell phone on two occasions; and, I have listened to the phone

calls between the UC Agent and "Manto" as well as the phone calls made from SPAGNOLI's cell phone during the authorized wire interceptions and believe determined that "Manto's" voice is one and the same as KLATMAN's voice.

40. On March 27, 2010 at 2:36 p.m., SPAGNOLI received the following call from JOHN DOE #3 in Illinois. JOHN DOE #3's true name was among the documents possessed by SPAGNOLI in the Bahamas.

SPAGNOLI: Hello.

DOE #3:   Michael, Hey it's [DOE #3].

SPAGNOLI: We are getting out teeth knocked in this week.

DOE #3:   I hope so.

SPAGNOLI: We are down two games we're gonna have to get back to even, I want you to get in Butler.

DOE #3:   Who?

SPAGNOLI: Butler.

DOE #3:   Get in Butler?

SPAGNOLI: Yeah.

DOE #3:   Ok.

SPAGNOLI: And, get a drink. They are plus 3 ½; they are playing Kansas State.

DOE #3:   Butler and Kansas State, what's the points?

SPAGNOLI: 4, 5, 6, they are about 3 ½ [IA].

DOE #3:   Ok.

SPAGNOLI: They are getting 3 ½ to 4 points so get in Butler. The game goes off in a little less than two hours and we'll touch base later.

41. Based upon my training and experience, the reference to "Butler" and "Kansas State" refers to the college basketball game between those two colleges and the betting point spread. Based upon the above conversation and the documents found in SPAGNOLI's possession in the Bahamas, I believe JOHN DOE #3 is one of SPAGNOLI's gambling customers.

42. On April 23 and 24, 2010, two FedEx packages were seized by CBP at the Memphis, Tennessee hub. Those packages were addressed to defendant KEVIN KLATMAN and were addressed to be delivered to the SUBJECT PREMISES. The packages were sent by a purported gambler from Canada, JOHN DOE #7. Each package contained approximately $15,000 in United States currency.

43. On April 30, 2010, SPAGNOLI called JOHN DOE #1, about the missing money as excerpted below:

SPAGNOLI: He ah, he's from Canada and he sent out a FedEx and it was actually seized by Homeland Security.

         *      *      *

DOE #1:   When was this?

SPAGNOLI: Ah, I don't know about a couple, about a week ago, and basically they sent him a letter saying to come down and, ah, in thirty days to come down and explain the content of his package.

DOE #1:   And his packages contained what, money?

SPAGNOLI: Yeah.

21

      *     *     *

DOE #1:   I mean how long have you had this guy?

SPAGNOLI: Ah, a couple months.

DOE #1:   Then I have no idea.

SPAGNOLI: Would they scan it and see that it's cash and maybe open it?

DOE #1:   But I've had, I've had cash sent from Canada and other places throughout the country, I've never, ever had to worry about anything like that. I've never heard of that situation before.

SPAGNOLI: Yeah.

DOE #1:   Unless like I said, this guy is for some reason is, you know, being looked at or could it be our address that is being looked at?

      *     *     *

DOE #1:   I mean in the past if I had a guy like send me some money, I've been tell him to put it in an envelope and write out a letter like "Dear Johnny, Congratulations on your Graduation."

SPAGNOLI: Hmm.

DOE #1:   Make it look like it's, you know, but that's a heck of a graduation gift.

SPAGNOLI: [LAUGHS]

DOE #1:   That would be a little bit more than the ordinary graduation gift for Johnny.

SPAGNOLI: Yeah.

      *     *     *

DOE #1:   Where did he send it to, IE Industries?

SPAGNOLI: Nah, to Kevin.

DOE #1:   Oh, I see, if he sent it to a company maybe you can come up with some kind of an invoice for something and that's what he was paying you for, who knows, you know I don't know [VOICES OVERLAP].

     \*    \*    \*

DOE #1:   And, it was going to our 1683, right there?

SPAGNOLI: Yeah.

     \*    \*    \*

DOE #1:   You know 'cause he's out of the country, I mean, otherwise I mean we have had many packages sent to the house and I've never had any problems.

SPAGNOLI: Right.

44. On May 2, 2010 at approximately 4:02 p.m., SPAGNOLI received the below voicemail message from KEVIN KLATMAN regarding the above referenced Canadian gambler's seized funds:

KLATMAN:   Yo Spags, what's up bro it's me. Uh, I'm at the house. Give me a call back. Just got off the phone with JOHN DOE #7. Pretty good conversation actually. I told him basically he's gotta get another thirty thousand to give us. "Are you kidding me? You want me to put my business here at risk?" I asked him as far as you know getting the money out of the bank, he said yes. As far as the um anniversary he said yes so I think everything should be good for us I hope.

45. On April 2, 2010, at 1:02 p.m., defendant DAVID SPAGNOLI had the following conversation with defendant KEVIN

KLATMAN.[5]  They discussed the fabricated story to tell a probable

gambler, JOHN DOE #8, about his money.

|  |  |
|--|--|
| SPAGNOLI: | Did you speak to that guy Mike? |

           *    *    *

|  |  |
|--|--|
| SPAGNOLI: | I came up with a story (laughs). |
| KLATMAN: | I'm looking at the fucking game, I'm looking at the game to try to figure out what I can tell him, if there was an unfair, you know, foul advantage or something about a referee but I'm like that would be pretty funny. |
| SPAGNOLI: | This is what I was going to tell JOHN DOE #8. Ah, basically I was going to tell, you know first I was gonna ask, well I wasn't really going to say that, actually I was gonna tell him, I was gonna pick up as my assistant and tell him that I was, ah, that a my flight didn't land yet. And then basically I was gonna tell him that ah, that something happened with the game last night and ah somebody, somebody some where told some people basically I was going to tell him a story about how at half time about how 25-35 people up and down the strip walked into casinos with a little more than a million dollars divided by all, divided in between them. And they move (laughs). |

           *    *    *

|  |  |
|--|--|
| SPAGNOLI: | I was gonna tell him ah, listen ah you know obviously ah I had to take a polygraph so they know obviously I had |

---

[5] Because of a problem with the telephone carrier, we did not initially obtain the telephone number SPAGNOLI called.  But, I have reviewed the call and compared it to other audio conversations with KLATMAN and have determined that the speakers are SPAGNOLI and KLATMAN.

no knowledge of this but they still
don't know if one of my people had
anything to do with this.  You know, ah
I guess it's similar, sounds believable.
It was a, they were only down a point at
half time so really the line you know,
for the second half would of been pretty
much, pretty close to what the line was
for the game.

KLATMAN:        Yeah, it probably was what 3 in the
first half and ... 3 for the second half
you know, 4.

SPAGNOLI:       Yeah, they were down once or whatever,
they were probably getting ah you know
like 3 or 4 points so I was, yeah I was
just going to tell him someone obviously
had people lined up because as soon as
the game went to half, some where in the
ball park of about 25-35 people up and
down the entire Vegas strip walked in
the casinos with a little more than a
million dollars divided between all of
them.

KLATMAN:        Like Michael didn't you tell me at one
time the most you can bet on bets the
most few thousand. Did you ever tell
them that before?

SPAGNOLI:       Ahh.

KLATMAN:        Think about that because if he's smart
and sharp he would think about it, I
know you said, well I said it to
everybody, well you can't bet what you
can bet on basketball but you can just
turn around and be like listen, yeah I
said that to you of course that's
college basketball you fucking idiot the
pro basketball it's the same.

SPAGNOLI:       I mean I could just say there was
however many more people you know.

KLATMAN:        Yeah.

25

SPAGNOLI:        Say there was a fucking hundred people
                 and I don't know what it takes to
                 mobilize a hundred people but obviously
                 somebody knew something somewhere.

KLATMAN:         Yeah, I guess so.

                    *      *      *

KLATMAN:         Is this kid calling me at 1:30?

SPAGNOLI:        Ah no he's calling me at one thirty.

KLATMAN:         Oh, he's calling you at 1:30, alright.
                 Cool, I just didn't know what name to
                 use or anything like that so ah.

SPAGNOLI:        Yeah, I was probably gonna do it for 2.
                 And he has to work at, I think he has to
                 be at work at 5 so basically he'll have
                 3 hours.

KLATMAN:         [UI] quick pitch I could probably give,
                 I'm sure [UI].

45.   On April 2, 2010, at 1:26 p.m., defendant SPAGNOLI
spoke with gambler JOHN DOE #8 and executed the plan he arranged
with KLATMAN.

46.   On April 6, 2010, at 4:54 p.m., defendant SPAGNOLI
received the following call from gambler JOHN DOE #9:

JOHN DOE #9:     I got it's Utah plus 4 ½.  You're really
                 high on this game, huh?

SPAGNOLI:        Um, after losing five games I wouldn't
                 say I'm high on it, but I like it. I am
                 optimistic that it better work.

JOHN DOE #9:     Did you get inside info?

SPAGNOLI:        Ah yes.

JOHN DOE #9:     You don't want to share it with me?

SPAGNOLI:        Um, with you?

| JOHN DOE #9: | Yeah. |
|---|---|
| SPAGNOLI: | Why? Would you be moving more or less on the game? |
| JOHN DOE #9: | No, but I'm you know, I want to see if this theory, [UI] whether it's true or a bunch of BS. |
| SPAGNOLI: | What, the theory of what? |
| JOHN DOE #9: | Theory that you get information on games. |
| SPAGNOLI: | Mm hm. |
| JOHN DOE #9: | That I can't get in a Google search. |

47.  On May 10, 2010, ICE conducted another trash run at the SUBJECT PREMISES which revealed the same type of paper trash being removed, namely, records of gambling activity including computer generated documents.

48.  Based on the facts set forth above, I believe that there is probable cause to believe that there are located inside the SUBJECT PREMISES: books, records, documents and computers, all of which constitute evidence, instrumentalities and fruits of violations of Title 18, United States Code, Sections 1084, 1343, 1955 and 1956.

**SPECIFICS REGARDING THE SEIZURE AND SEARCHING OF COMPUTER SYSTEMS**

49.  Based upon the information set forth in this Affidavit, I believe that SPAGNOLI and other suspects used computers at the SUBJECT PREMISES to create, process, and store information and documentation that would constitute fruits and

27

instrumentalities of violations of the offenses described in this affidavit.

50. If computers or electronic media are present during the search, then those materials will be forensically imaged at the time and place of the search, if forensically feasible. However, based on my own experience and consultation with other law enforcement agents and detectives who have been involved in the search of computers and retrieval of data from computer systems and related peripherals, and computer media, there are several reasons why a complete search and seizure of information from computers often requires seizure of all electronic storage devices, as well as all related peripherals, to permit a thorough search later by qualified computer experts in a laboratory or other controlled environment:

a. Computer storage devices, such as hard disks, diskettes, tapes, laser disks, and Bernoulli drives, can store the equivalent of hundreds of thousands of pages of information. Additionally, when an individual seeks to conceal information that may constitute criminal evidence, that individual may store the information in random order with deceptive file names. As a result, it may be necessary for law enforcement authorities performing a search to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This review and sorting process can take

weeks or months, depending on the volume of data stored, and would be impossible to attempt during a search on site; and

        b.  Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even those who are computer experts to specialize in some systems and applications.  It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data.  In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

        51.  Based on my own experience and my consultation with other law enforcement agents and detectives who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert

can accurately retrieve the system's data in a laboratory or other controlled environment.   There are several reasons that compel this conclusion:

a.   The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software.   Many system storage devices require particular input/output devices in order to read the data on the system.   It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.   In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b.   In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU).   In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce.   Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create

the data (whether stored on hard drives or on external media) for proper data retrieval.

   c. I am familiar with and understand the implications of the Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa, and the role of this statute in protecting First Amendment activities.  I am not aware that any of the materials to be searched and seized from the SUBJECT PREMISES are protected materials pursuant to the PPA.  If any such protected materials are inadvertently seized, all efforts will be made to return these materials to their authors as quickly as possible.

WHEREFORE, your Affiant respectfully requests that the defendants DAVID SPAGNOLI, also know as "John Corbin," and KEVIN KLATMAN, also known as "Mike Manto," be dealt with according to law.

FURTHERMORE, your Affiant respectfully requests that a search warrant issue allowing agents of Immigration and Customs Enforcement, with proper assistance from other law enforcement officers, to search THE PREMISES KNOWN AND DESCRIBED AS A TWO STORY BUILDING LOCATED AT 1683 ROOSEVELT AVENUE, BOHEMIA, NEW YORK, and therein, to seize any and all books, records, documents and computers, and items particularized in Attachment A to the search warrant presented with this affidavit, all of which constitute evidence, instrumentalities and fruits of violations of Title 18, United States Code, Section 1084, 1343, 1955 and 1956.


ERIC MANCINI
Special Agent
Immigration and Customs
Enforcement


Sworn to before me this
22 day of June, 2010


/s/William D. Wall
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

32

Exhibit 1